UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

UNITED STATES OF AMERICA and
STATE OF WEST VIRGINIA,
by and through the
WEST VIRGINIA DEPARTMENT OF
ENVIRONMENTAL PROTECTION, and
COMMONWEALTH OF KENTUCKY,
by and through the,
ENERGY AND ENVIRONMENT CABINET,

      Plaintiffs

v.                              Civil Action No. 2:11-0133

ARCH COAL, INC. and
COAL MAC, INC. and
LONE MOUNTAIN PROCESSING, INC. and
CUMBERLAND RIVER COAL COMPANY and
MINGO LOGAN COAL COMPANY,

      Defendants

<u>MEMORANDUM OPINION AND ORDER</u>

      Pending are (1) the United States' motion to enter the
proposed consent decree, filed May 2, 2011, (2) the motion to
intervene of Ohio Valley Environmental Coalition, Inc., Sierra
Club, and West Virginia Highlands Conservancy, Inc. ("citizen
organizations")[1], filed April 14, 2011, and (3) the citizen

---

      [1]Ohio Valley Environmental Coalition, Inc. ("OVEC") consists
of 1,500 members.  It is a grassroots non-profit group dedicated
to environmental concerns, with a particular emphasis on water
quality.  West Virginia Highlands Conservancy, Inc. ("the
Conservancy") is a non-profit group with 1,800 members.  It has
for thirty years led  citizen efforts to address pollution issues
in West Virginia.  Sierra Club is a nonprofit organization
                                      (continued...)

organizations' motion to consolidate this civil action with <u>Ohio Valley Environmental Coalition, Inc. et al v. Coal-Mac, Inc.</u>, No. 3:10-0833 ("Huntington action"), presently pending before the Honorable Robert C. Chambers, filed April 14, 2011.  The instant case is referred to throughout as the "Charleston action."


I.


A.   The Huntington Action


On April 14, 2010, the citizen organizations gave notice to Coal-Mac, Inc. ("Coal-Mac"), Mingo Logan Coal Company ("Mingo Logan"), the United States Environmental Protection Agency ("EPA"), the Office of Surface Mining, Reclamation, and Enforcement ("OSMRE"), and the West Virginia Department of Environmental Protection ("WVDEP") of their intention to institute a civil action against Coal-Mac and Mingo Logan for certain alleged federal environmental law violations.

---

[1](...continued)
boasting over 600,000 members and supporters nationwide, with approximately 1,900 members residing in West Virginia.  It too is devoted to environmental concerns.

2

The citizen organizations allege that, despite this notice, EPA, OSMRE, and WVDEP failed to seasonably commence a civil or criminal action to redress the alleged violations, or an administrative penalty action. On June 11, 2010, however, the United States informed the citizen organizations that it was in negotiations with Arch Coal, Inc. ("Arch"), the parent corporation of Coal-Mac and Mingo Logan. The negotiations were aimed, in part, at addressing violations of selenium discharge limits by defendants. One focus of the discussions was West Virginia/National Pollution Discharge Elimination System ("WV/NPDES") permit WV1003763.[2]

The United States sought out the citizen organizations' views at multiple points. After months of intense negotiations, the United States provided the citizen organizations with draft language of the injunctive relief provisions found in the draft proposed consent decree. It also engaged the citizen groups and their expert respecting the selenium treatment provisions of the draft proposed consent decree. Following these discussions, the United States sent a detailed letter to the citizen organizations purporting to address each of their concerns regarding selenium

---

[2]West Virginia is authorized to administer a state-run NPDES program pursuant to 33 U.S.C. § 1342(b). WVDEP is the permitting authority for the state's NPDES program.

treatment.  The United States then made revisions to the draft proposed consent decree and finalized it.

On June 17, 2010, the citizen organizations instituted the Huntington action for declaratory and injunctive relief. They accused Coal-Mac and Mingo Logan of violating the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq. ("Clean Water Act" or "CWA"), and the Surface Mining Control and Reclamation Act, 30 U.S.C. § 1201 et seq. ("SMCRA").

The citizen organizations specifically alleged, inter alia, that Coal-Mac and Mingo Logan are discharging selenium into waters of the United States in persistent violation of section 301 of the Clean Water Act, 33 U.S.C. § 1311, and of the conditions and limitations found in four  WV/NPDES permits issued to those two defendants by the State of West Virginia.

One of the referenced WV/NPDES permits is WV1003763, issued to Coal-Mac to regulate discharges at its Hobet No. 7 Mine.  The "permit governs discharges into the Left Fork of Right Fork of Trace Fork of Pigeon Creek from Outfall 002." Ohio Valley Environmental Coalition, Inc. v. Coal-Mac, Inc., No. 3:10-0833, --- F. Supp.2d ----, ----, 2011 WL 1237643, at *3 (S.D. W. Va. Mar. 31, 2011).  The material allegations relating to

**4**

WV/NPDES WV1003763 are as follows:

> Coal-Mac has accrued at least 440 days of violation of
> the selenium limits on Outfall 002 by discharging
> selenium in excess of the final effluent limitations
> for selenium from Outfall 002 on 29 occasions . . . .
>
> On the basis of Coal-Mac's pattern of violations
> of its effluent limitations . . . and the absence of
> any evidence of any meaningful efforts by Coal-Mac to
> eradicate the cause of the violations, Plaintiffs
> allege that Coal-Mac is in continuing and/or
> intermittent violation of the Clean Water Act . . . .

(Huntington Action Compl. ¶¶ 49-50).

On March 31, 2011, Judge Chambers entered a memorandum opinion and order. He concluded, _inter alia_, that the citizen organizations were entitled to judgment as a matter of law respecting their claim relating to WV/NPDES WV1003763. The effect of that ruling, however, was subject to the following proviso:

> The Consent Decree entered into by Defendant Coal-Mac
> and the EPA [that is the subject of the Charleston
> action] establishes a Selenium Compliance Plan with
> regard to Coal-Mac's WV/NPDES Permit 1003763, Outfall
> 002. The Consent Decree is currently before the court
> in . . . [the Charleston action], and will only become
> final if and when the court approves it. As the Court
> finds that the Consent Decree [in the Charleston
> action] most likely moots Plaintiffs' claims with
> respect to this permit, it STAYS the effect of this
> Opinion on WV/NPDES Permit 1003763. When a decision is
> reached on the Consent Decree [in the Charleston
> action], the parties are DIRECTED to inform the Court
> of its final disposition, at which point the Court will
> determine whether Plaintiffs' claims with regard to
> Coal-Mac's WV/NPDES Permit 1003763 should be dismissed

5

on mootness or <u>res judicata</u> grounds.

<u>Ohio Valley Environmental Coalition, Inc. v. Coal-Mac, Inc.</u>, No. 3:10-0833, --- F. Supp.2d ----, ----, 2011 WL 1237643, at *27 (S.D. W. Va. Mar. 31, 2011).


B.   The Charleston Action


          Plaintiffs in the Charleston action are the United States, the State of West Virginia, by and through WVDEP, and the Commonwealth of Kentucky, by and through the Kentucky Energy and Environment Cabinet ("KEEC").  The principal defendant is Arch. The remaining defendants are Coal Mac, Lone Mountain Processing, Inc., Cumberland River Coal Company, and Mingo Logan (collectively "the subsidiary defendants").

          Arch manages, directs, or controls environmental compliance at facilities owned by the subsidiary defendants.  As a result of their coal mining and processing operations, the subsidiary defendants generate coal slurry, wastewater, and other spoil-type materials that consist of, or contain, pollutants including iron, aluminum and manganese, certain solids, and selenium.

6

On December 20, 2007, the EPA sought what appears to be an effluent spreadsheet from Arch for various permits issued to the subsidiary defendants.  EPA wished to ascertain all effluent limitation exceedances occurring from January 1, 2003, through January 1, 2008.  Arch ultimately produced the information through December 30, 2010.  The document reflects a total of at least 808 discharge violations.  Other illegal discharges were cited or noticed by West Virginia and Kentucky as well.  Plaintiffs allege that the subsidiary defendants' unpermitted and exceedance discharges caused, or have the potential to cause, environmental harm, including degradation to various waterways and associated aquatic ecosystems.

On March 1, 2011, plaintiffs instituted this action against defendants.  It is brought pursuant to federal, West Virginia, and Kentucky law.  Plaintiffs allege that defendants have discharged, and will continue to discharge, pollutants into waters of the United States, West Virginia, and Kentucky in violation of those laws.

Plaintiffs also allege that defendants are in violation of the conditions and limitations of NPDES permits issued by, inter alia, West Virginia and Kentucky pursuant to state and federal law.  They seek permanent injunctive relief and civil

7

penalties against defendants to halt the illegal discharges, as authorized by the statutes proscribing the violations.

C.  The Proposed Consent Decree Lodged in the Charleston Action

Simultaneous with the institution of the Charleston action, the United States filed the proposed consent decree mentioned above, along with a notice reflecting its lodging with the court ("notice of lodging").  Some of the work preceding the negotiated resolution is found in the memorandum in support of the United States' motion to enter the proposed consent decree:

> The Decree was reached only after two and a half years of arms-length negotiations between the parties, each of whom was represented by qualified counsel. Many issues were vehemently contested, and over the years of negotiations there were multiple in-person meetings along with countless phone calls and emails, resulting in the exchange of numerous proposed injunctive relief drafts. Negotiations were based on information provided in response to EPA's information request under Section 308 of the Act, information provided by WVDEP and Kentucky, input from experienced scientists within the relevant government agencies, input from expert consultants hired by the United States, and visits to facilities owned and operated by Defendants. Moreover, the United States provided the Citizen Groups an opportunity to comment on multiple occasions and assessed those comments in determining the appropriateness of the proposed settlement.

(U.S. Memo. in Supp. at 11).

8

It appears that the United States, on March 7, 2011, published the notice of lodging in the Federal Register.  It provided that "The Department of Justice w[ould] accept comments relating to the proposed consent decree for a period of thirty (30) days from the date of publication of th[e] notice."  Not., 76 Fed. Reg. 12369 (Mar. 7, 2011).  In its March 1, 2011, notice of lodging, the United States stated that, "If, after review and evaluation of any comments received, the United States continues to believe that the . . . [proposed consent decree] is fair, reasonable, and in the public interest, it will move the Court to enter" it.  Id.  On April 6, 2011, the citizen organizations filed with the United States the only comments received concerning the proposed consent decree.

The proposed consent decree specifically addresses WV/NPDES WV1003763.

> **Selenium**. This . . . [proposed consent decree] only addresses violations of selenium effluent limits relating to NPDES permit No. WV1003763, Outlet 002. The provisions of this . . . [proposed consent decree] do not otherwise apply to selenium effluent limits applicable to Defendants' Facilities or Future Facilities.

(See Prop. Cons. Decr. ¶ 9).  Article VIII of the proposed consent decree governs "SELENIUM INJUNCTIVE RELIEF."  The material provisions found there are as follows:

9

1.  Defendants have applied for the permits necessary to implement the Selenium Compliance Plan attached as Exhibit C to the proposed consent decree;

2.  The Selenium Compliance Plan calls for construction of a passive biological treatment mechanism capable of treating 60 gallons of water per minute from an 8.7 acre watershed;

3.  Within the later of 30 days after receiving the permits or April 15, 2011, defendants must commence construction of the Selenium Treatment System called for in the proposed consent decree;

4.  No later than the later of 100 days after receiving the permits or July 24, 2011, the Selenium Treatment System must be operational;

5.  Once the Selenium Treatment System becomes operational, and for 365 days after the December 31, 2011, Selenium Compliance Deadline by which compliance with the selenium limits must be achieved, defendants must conduct rigorous sampling; and

6.  Within 180 days after commencing operation of the Selenium Treatment System, but no later than November 1, 2011, defendants must submit to the United States and West Virginia a Selenium Treatment System Evaluation Report.[3]

---

[3]The Selenium Treatment System Evaluation Report will include:

(a) an evaluation of the System's effectiveness in removing selenium up to the time of the Selenium Treatment System Evaluation Report; (b) an analysis of the System's impact, if any, on discharges of other pollutants regulated by NPDES permit No. WV1003763; [and] (c) an analysis, including supporting documentation, of whether the system will ensure compliance with Selenium Limits by the Selenium Compliance Deadline, taking into account implementation of any proposed changes to improve the performance of

(continued...)

The proposed consent decree also calls for an Alternative Selenium Compliance Plan in the event that the Selenium Treatment System fails to achieve certain specified remedial benchmarks.  The Alternative Selenium Compliance Plan, which appears to have already been presented to the United States for approval, along with West Virginia for review, involves installation of a "Reverse Osmosis or Active Biological Treatment system [that will] . . . include a detailed schedule for design and implementation of one of those systems."  (Id. ¶ 68).

Plaintiffs have additionally "reserve[d] their right to seek other injunctive relief for violations of the Selenium Limits after the [December 31, 2011, deadline] . . . ."  (Id. ¶ 71).  Stipulated penalties in amounts ranging from $1,000 to $15,000 per day apply to any violations of the section of the proposed consent decree dealing with selenium-related injunctive relief.

Article XX of the proposed consent decree governs termination, and provides as follows:

_____

[3](...continued)
the system, if appropriate.

(Prop. Consent Decr. ¶ 64).  Other reporting obligations appear in paragraph 76 of the proposed consent decree.

> After Defendants have completed the requirements
> of Paragraphs 30-41 (Compliance Management System and
> CMS Audit) of this Decree and have thereafter
> maintained continuous satisfactory compliance with
> Section VI (Compliance Requirements), Section VII
> (Injunctive Relief), and Section IX (Reporting
> Requirements) of this Consent Decree <u>for a period of
> four years</u>; <u>have completed the requirements of Section
> VIII</u> (Selenium Injunctive Relief); and have paid the
> civil penalty and any accrued stipulated penalties as
> required by this Consent Decree, Defendants may serve
> upon the United States and the States a Request for
> Termination, stating that Defendants have satisfied
> those requirements, together with all necessary
> supporting documentation.

(<u>See</u> Prop. Cons. Decr. ¶ 136 (emphasis added)).


D.   The Citizen Organizations' Intervention Request


On April 14, 2011, the citizen organizations moved to intervene in this action "for the limited purpose of objecting to and challenging the proposed consent decree's resolution of claims related to unlawful selenium discharges regulated by WV/NPDES . . . WV1003763."  (Mot. to Interv. at 2).  They assert, <u>inter</u> <u>alia</u>, that "flaws in the Proposed Consent Decree . . . . will necessitate discovery in this matter."  (<u>Id.</u> n.2).  In their motion to consolidate, the citizen organizations suggest that they may ultimately seek an evidentiary hearing.

The citizen organizations' individual members assert that they have suffered, or may suffer, injury to their aesthetic, recreational, and environmental interests as a result of Coal-Mac's unlawful selenium discharges related to WV/NPDES WV1003763.  Cindy Rank is a long-time member of the Sierra Club and chairs the Conservancy's mining committee.  She notes as follows:

> As I understand it, Coal-Mac, Inc., holds Clean Water Act WV/NPDES Permit[] WV0003763 . . . which regulate[s] discharges . . . to the Right Fork of Trace Fork of Pigeon Creek upstream of the town of Scarlet. . . .
>
> Streams in these areas are known to have unacceptable amounts of selenium. It angers me that Coal-Mac is violating selenium limits set forth in these permits.  Were Coal-Mac to comply with the company's permit limits for selenium it would improve the water quality and protect aquatic life downstream. It would also greatly increase my own enjoyment of the streams.

(Aff. of Cindy Rank at 3).

She  describes the "scene upstream from Scarlet[, WV,] along Trace Fork" of Pigeon Creek as "lovely, especially the bit of waterfall near the houses at the end of the paved road." (Id. at 4).  She has "delighted in splashing" the cool water of Trace Fork of Pigeon Creek with her hands.  (Id.)  She notes, however, that her "enjoyment of that area is . . . hampered by the knowledge the discharges upstream are selenium laden and threaten

13

the aquatic life in the area." (Id.)  She plans on visiting the Scarlet and Trace Fork area of Pigeon Creek in the future.

        Vivian Stockman is a long-time member of both OVEC and the Conservancy.  She states that she has frequently traveled in the vicinity of Coal-Mac's mining operation regulated by WV/NPDES Permit WV1003763.  She notes that she has "visited Right Fork of Trace Fork of Pigeon Creek above the town of Scarlet immediately downstream of the discharges from the Coal Mac permits" and that she intends to return to this area in the future.  (Am. Decl. of Vivian Stockman at 3).  She also observes that:

> [t]he stream here is small but lovely, very inviting on
> a summer day. Mint grows along the stream and
> wildflowers, too.  But the water seems strangely and
> disturbingly devoid of life.  When I picked up rocks to
> look, I saw few critters nestled underneath and I saw
> no minnows.  I am concerned that selenium may be having
> an effect on the aquatic life in this stream.

(Id.)  She elaborates further on the damage that she perceives Coal Mac is responsible for:

> I . . . understand that Coal-Mac has been
> violating the selenium discharge limits in [WV/NPDES
> WV0003763].  The selenium pollution coming from the
> mines greatly concerns me and decreases my enjoyment of
> the reaches downstream of the mines.
>
>     I can't help but wonder about what is going on
> upstream -- whether pollution from the mines is harming
> the creatures that depend on clean water. My enjoyment
> of the stream is harmed because of my concern over
> water pollution. I am also very concerned about the
> cumulative impacts of water pollution coming from the
> mines upstream.

14

If Coal-Mac complied with selenium permit limits
and was meeting Clean Water Act requirements, it would
increase my enjoyment of the streams downstream from
the discharges.

(Id. at 2).

The discussion proceeds in two parts.  First, the court

analyzes the intervention request, including the governing law,

Article III standing considerations, the limitations, if any,

that might be placed upon the participation of intervenors of

right in a federal civil case, and the further development of

this action necessary for the mature consideration of the

proposed consent decree.  Second, the court addresses the

consolidation request.

II.

A.   Motion to Intervene

1.  The Law Governing Intervention

The intervention request is based upon Federal Rule of

Civil Procedure 24(a)(1) and CWA section 505(b)(1)(B), 33 U.S.C.

§ 1365(b)(1)(B).  Rule 24(a)(1) provides in pertinent part that

"the court must permit anyone to intervene who . . . is given an unconditional right to intervene by a federal statute . . . ." Id.  Section 1365(b)(1)(B) states as follows:

> No [citizen suit] . . . may be commenced . . . if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States, or a State to require compliance with the standard, limitation, or order, <u>but in any such action in a court of the United States any citizen may intervene as a matter of right</u>.

33 U.S.C. § 1365(b)(1)(B) (emphasis added); <u>Chesapeake Bay Foundation v. American Recovery Co., Inc.</u>, 769 F.2d 207, 209 (4th Cir. 1985).

## 2. Standing to Support Intervention

Defendants assert that the citizen organizations lack standing to intervene.  They contend that the citizen organizations "assert only amorphous claims that distinctly are not particularized to the selenium discharges at issue."  (Defs.' Resp. to Mot. to Interv. at 2).  The assertion appears aimed at the first two requirements for Article III standing:

> [The citizen organizations' members who assert standing have failed to demonstrate either] (i) a concrete injury or (ii) that whatever harm may exist is traceable to the upstream discharges from the outlet. In the absence of any supporting factual information, the Court has no basis to conclude that . . . [the members] suffer[] concrete harm from selenium or that

16

the harm can be traced to the selenium discharges from
the Arch outlet.

(Id. at 4).


Some courts of appeal require that those seeking to
intervene in an action must demonstrate Article III standing, an
element of justiciability, as a constitutional prerequisite.[4]
Allen v. Wright, 468 U.S. 737, 750 (1984).  Standing "tends to
assure that the legal questions presented to the court will be
resolved, not in the rarefied atmosphere of a debating society,

---

[4]The parties and citizen organizations do not discuss an
apparent split of authority in the circuits respecting the
necessity of putative intervenors demonstrating Article III
standing.  See, e.g., Tyler R. Stradling & Doyle S. Byers,
Intervening in the Case (or Controversy): Article III Standing,
Rule 24 Intervention, and the Conflict in the Federal Courts,
2003 B.Y.U. L. Rev. 419, 424-25 (2003) ("Eight of the federal
circuits have considered whether Article III standing is required
of intervenors, and their holdings are split. This split is a
result of two different approaches to standing: some courts view
standing as a requirement on every party that comes before the
court while other courts view standing as a requirement the court
must ensure is satisfied by at least one party before it can
maintain jurisdiction."); Juliet Johnson Karastelev, On the
Outside Seeking In: Must Intervenors Demonstrate Standing to Join
a Lawsuit?, 52 Duke L.J. 455, 467 (2002).
      At least insofar as permissive intervention is concerned,
the author of the article immediately preceding notes our court
of appeals' decision in Shaw v. Hunt, 154 F.3d 161, 166 (4th Cir.
1998).  In Shaw, it was observed as follows: "As previously
noted, plaintiff-intervenors' right to party status -- given
their lack of standing -- is dependent upon the existence of at
least one plaintiff with Article III standing." Id. at 167.
      The brief language in Shaw does not constitute a definitive
analysis on the point.  The court need not further address the
issue in view of the standing analysis found infra.

but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." <u>Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.</u>, 454 U.S. 464, 472 (1982).

To satisfy the standing prerequisite, an intervenor must show, at an "irreducible constitutional minimum," that (1) it has suffered an "'injury in fact'" that is concrete and particularized, and is actual or imminent, (2) the injury is fairly traceable to the challenged action of the defendant; and (3) the injury likely will be redressed by a favorable decision. <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560-61 (1992) (citations omitted).

With respect to the standing inquiry in water quality cases, our court of appeals recently observed as follows:

> [A] plaintiff is not required to show environmental harm to establish an injury in fact. . . . [Our precedent discloses] that CLEAN member Shealy established an injury in fact by asserting <u>a reasonable fear and concern about the effects of the facility's discharge on his use and enjoyment of his lake, which is located four miles downstream of Gaston's facility</u>.

<u>Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.</u>, 629 F.3d 387, 394 (4th Cir. 2011) (emphasis added) ("<u>Gaston Copper II</u>"); <u>Ohio Valley Environmental Coalition v. Aracoma Coal Co.</u>, 556 F.3d 177, 193 (4th Cir. 2009) (further observing that

18

"environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity.") (internal quotation marks omitted) (quoting <u>Friends of the Earth, Inc. v. Laidlaw Environmental Servs.</u>, 528 U.S. 167, 183 (2000)) (quoting <u>Sierra Club v. Morton</u>, 405 U.S. 727, 735 (1972)).

For many years the Supreme Court and our court of appeals have similarly, and consistently, observed that damage to an individual's aesthetic or recreational interests "may be vindicated in the federal courts." <u>See</u>, <u>e.g.</u>, <u>Laidlaw</u>, 528 U.S. at 184; <u>Friends of the Earth, Inc. v. Gaston Copper</u>, 204 F.3d 149, 154 (4th Cir. 2000) ("<u>Gaston Copper I</u>")(en banc) (citing cases). In the end, "If the plaintiff can show that his claim to relief is free from excessive abstraction, undue attenuation, and unbridled speculation, the Constitution places no further barriers between the plaintiff and an adjudication of his rights." <u>Gaston Copper I</u>, 204 F.3d at 155.

If an individual with standing belongs to a representative organization wishing a role in the litigation, the court next examines if the organizational plaintiff may properly appear. That appearance will be authorized if the requirements

19

for representational standing are met:

> [A]n association may have standing to sue in federal
> court either based on an injury to the organization in
> its own right or as the representative of its members
> who have been harmed.  An organization has
> representational standing when (1) at least one of its
> members would have standing to sue in his own right;
> (2) the organization seeks to protect interests germane
> to the organization's purpose; and (3) neither the
> claim asserted nor the relief sought requires the
> participation of individual members in the lawsuit.

Gaston Copper I, 204 F.3d at 155 (citations omitted).


### 3.  Standing Analysis


Defendants offer a number of assertions designed to

demonstrate that both Ms. Rank and Ms. Stockman, and thus the

citizen organizations to which they belong, lack standing.

Defendants first appear to assert that Ms. Rank and Ms. Stockman

do not own property in the area downstream from the outfall

responsible for the selenium discharges in this action.  An

ownership interest is not required.  See, e.g., American Canoe

Ass'n v. Murphy Farms, Inc., 326 F.3d 505, 517 (4th Cir. 2003)

("In the environmental litigation context, the standing

requirements are not onerous. '[E]nvironmental plaintiffs

adequately allege injury in fact when they aver that they use the

affected area and are persons "for whom the aesthetic and

20

recreational values of the area will be lessened" by the
challenged activity."'") (quoting Laidlaw, 528 U.S. at 183
(quoting Sierra Club v. Morton, 405 U.S. 727, 735 (1972)).

Next, defendants contend that Ms. Rank and Ms. Stockman
are simply "roving environmental ombudsm[e]n seeking to right
environmental wrongs wherever . . . [they] might find them."
Gaston Copper I, 204 F.3d at 157.  Ms. Rank is aware of Coal-
Mac's selenium discharges under WV/NPDES WV0003763.  She
specifically states that compliance by Coal-Mac would improve
water quality in the area, protect aquatic life, and, most
importantly, greatly increase her enjoyment of the water in the
area.  She is quite familiar with the vicinity of the discharges,
describing the location in detail.  She also specifies her use of
the waters downstream and notes that she will visit the area in
the future.

Ms. Stockman frequently travels in southern West
Virginia and mentions specifically the area around Coal-Mac's
mining operation regulated by WV/NPDES WV1003763.  She also
intends to return to this area in the future.  She describes the
location downstream and the harm that she perceives as a result
of Coal-Mac's selenium discharges under WV/NPDES WV1003763.
Additionally, if Coal-Mac brought its discharges into compliance

21

with its permit, Ms. Stockman states, like Ms. Rank, that it would increase her enjoyment of the streams in the area.

These are the precise type of concrete and individualized interests sanctioned by our court of appeals' decisions in <u>Gaston Copper I</u>, <u>Gaston Copper II</u>, and <u>OVEC</u>. Defendants' contention is thus not well taken.

Third, defendants assert that neither Ms. Rank nor Ms. Stockman have alleged that their injuries are fairly traceable to Coal-Mac's actions.  Ms. Rank alleges that (1) streams in the area have unacceptable amounts of selenium, (2) Coal-Mac has violated its selenium limits under the relevant permit, and (3) water quality and aquatic life would improve if Coal-Mac complied.  As noted, Ms. Stockman asserts that Coal-Mac's compliance with its selenium permit limits would increase her enjoyment of the areas downstream from the discharges.  These tailored allegations satisfy the second prong of the standing inquiry.  There is a clear link alleged between Coal-Mac's selenium exceedances and Ms. Rank's and Ms. Stockman's alleged injuries.

Fourth, defendants contend that Ms. Rank's "interest is in something other than the stream at issue in this decree."

22

(Def.'s Resp. at 3).  They contend that her interest in visiting "Trace Fork" is essentially irrelevant inasmuch as the permitted discharge flows first into an unnamed tributary, then into the Left Fork of Trace Fork, and only then into Trace Fork.  They note as well that Ms. Stockman appears to have visited the Right Fork, as opposed to the Left Fork, of Trace Fork, the latter of which is where the permitted discharges occur.

It is the case that the allegations identified by defendants could have been more particularized.  If defendants persist in their standing challenge hereafter, the court will require further detail respecting how far downstream the selenium effect might be found and the precise location where Ms. Rank and Ms. Stockman use the waterway.  At this stage, however, at least four considerations are noteworthy.  First, as observed earlier, both Ms. Rank and Ms. Stockman contend that Coal-Mac's compliance with its selenium permit limits would increase their enjoyment of the areas downstream from the discharges.  Second, defendants have consented in the Charleston action to the installation of a costly selenium treatment protocol relating to discharges under WV/NPDES Permit WV1003763 that flow downstream.[5]  Third, Judge

_____

[5]The United States' memorandum in support of its motion to enter the proposed consent decree elaborates upon the
(continued...)

Chambers, in the Huntington action, relied upon the same affidavits filed in this action to conclude that Ms. Rank and Ms. Stockman had satisfied the standing rubric.  <u>Ohio Valley Environmental Coalition, Inc. et al v. Coal-Mac, Inc.</u>, No. 3:10-0833, --- F. Supp. 2d ---, ---, 2011 WL 1237643, at *9-11 (S.D. W. Va. Mar 31, 2011).  It is noteworthy as well that Judge Chambers entered judgment as a matter of law in favor of the citizen organizations respecting their claims relating to WV/NPDES WV1003763.  All of these considerations taken together sufficiently establish the necessary link at this stage between the harms alleged by Ms. Rank and Ms. Stockman and the permit exceedances.

---------------------

[5](...continued)
circumstances that gave rise to defendants' apparent concession:

> Defendants disclosed [midway through negotiations with the United States] that Coal Mac, Inc. was out of compliance with effluent limits for selenium applicable to Outlet 002 for NPDES permit No. WV1003763.  Given the unique treatability issues presented by selenium, the parties began negotiating selenium-specific injunctive relief for that outlet. Defendants hired CH2M Hill, a consultant with experience implementing selenium treatment technologies at coal mining operations in West Virginia, to develop an outlet-specific treatment plan.

(U.S. Memo. in Supp. at 5).

24

Defendants next assert that the citizen organizations have not submitted scientific evidence of elevated selenium levels at the stream locations visited by Ms. Rank and Ms. Stockman.  The court of appeals in Gaston Copper I explained a similar hurdle set by the district court in that case:

> The [district] court pointed to the supposed absence of certain types of evidence: "No evidence was presented concerning the chemical content of the waterways affected by the defendant's facility. No evidence of any increase in the salinity of the waterways, or any other negative change in the ecosystem of the waterway was presented." The district court therefore concluded that "[n]o evidence was presented that any plaintiff member has been adversely affected by the defendant's conduct."

Gaston Copper I, 204 F.3d at 155.  The court of appeals parted company with the analysis:

> We disagree. CLEAN has surpassed the threshold that Article III and the Clean Water Act set for establishing a case or controversy. Wilson Shealy is a classic example of an individual who has suffered an environmental injury in fact fairly traceable to a defendant's conduct and likely to be redressed by the relief sought. The trial court erred therefore in creating evidentiary barriers to standing that the Constitution does not require and Congress has not embraced. In fact, the legislative branch has invited precisely the type of suit brought by CLEAN. The judicial branch is not at liberty to impede its resolution on the merits.

Id. at 155-56.  Defendants' contention lacks merit.

Based upon the foregoing discussion, the court concludes that Ms. Rank and Ms. Stockman have adequately alleged

25

the three prerequisites for Article III standing.  Inasmuch as (1) at least one of them is a member of each of the citizen organizations, (2) the citizen organizations seek to protect interests related to their purposes, and (3) no party asserts that either Ms. Rank or Ms. Stockman need personally be involved in this action, the requirements for representational standing are likewise satisfied.  Finally, satisfaction of the Article III standing requirement satisfies the rigors of its statutory counterpart.  See Gaston Copper I, 204 F.3d at 155  ("Thus, if a Clean Water Act plaintiff meets the constitutional requirements for standing, then he ipso facto satisfies the statutory threshold as well.").

Based upon the foregoing discussion, it is ORDERED that the citizen organizations' motion to intervene be, and it hereby is, granted so as to permit them to be heard on the issues they raise, namely, (1) the suitability of the proposed civil penalty as it relates to the selenium violations, and (2) the putatively superior selenium treatment protocols.[6]

---

[6]The proposed complaint in intervention appears to address issues in addition to those identified by the citizen organizations in the briefing related to their intervention request.  The court, accordingly, does not order the proposed complaint in intervention filed at this time.

26

## 4. The Necessity of Discovery

The United States notes, without objection, that the citizen organizations challenge only "the resolution of approximately four percent of the violations" resolved by the proposed consent decree in the Charleston action.  (U.S. Resp. to Mot. to Interv. at 1, 4 n.2).  As noted, however, as to that four percent alone, the citizen organizations suggest that they should be permitted discovery and an evidentiary hearing.  The United States' position is encapsulated below:

> [S]hould the Court grant intervention, the United States respectfully requests that the Court place reasonable limits on the Citizen Groups' participation, given the procedural posture of this case.  The settlement . . . is the product of lengthy negotiations supported by substantial information gathering. Under well-settled case law, this Court is tasked with determining whether the proposed Decree is fair, reasonable, adequate, and consistent with public interest -- not with conducting a trial on the merits after full discovery. Further factual discovery at this point in time is neither necessary nor appropriate, particularly in the context of a fair settlement reached by the government on behalf of the public.

(Id. at 2).  The United States asserts that if intervention is granted, the citizen organizations should be limited to filing legal briefs and appealing the proposed consent decree if it is entered.  Defendants join in the United States' contentions.

27

The citizen organizations respond that due process demands they be allowed to gather and present sufficient information to the court in order to facilitate a thorough evaluation of their objections to the proposed consent decree. They point to an insufficient record on two issues central to the fairness, adequacy, and reasonableness of the accord:

> First, the United States has been consistently unwilling to explain how it arrived at the civil penalty in the Consent Decree as it relates to the selenium violations that are part of Proposed Intervenors' CWA citizen suit. That information is crucial to evaluating Proposed Intervenors' claims that the Consent Decree is not in the public interest because the record does not establish that the civil penalty is sufficient to recoup the company's economic benefit from non-compliance and thus may be insufficient to deter future violations. Although the United States asserts that the penalty is greater than Arch Coal's economic benefit from violating the CWA, it has provided no justification for that conclusion. Second, the United States has not meaningfully responded to Proposed Intervenors' concerns that the selenium-related injunctive relief in the Consent Decree may fail to achieve compliance with the Clean Water Act. Proposed Intervenors have repeatedly raised the concern, supported by sound science, that the trial period for the passive biological treatment system improperly ends before the system's performance in cold weather high flow conditions can be evaluated.

(Citiz. Orgs. Reply at 9-10). The citizen organizations seek eight weeks for discovery, voluntarily limiting themselves to (1) a period of two weeks to submit requests for production, (2) the taking of three depositions, and (3) the service of five interrogatories.

As the citizen organizations observe, the court is obliged to assess the fairness, adequacy, and reasonableness of the proposed consent decree.  That obligation is not without substance:

> [The court must] ensure that it is able to reach "an _informed_, just and reasoned decision."  In particular, the "court should consider _the extent of discovery that has taken place_, the stage of the proceedings, the want of collusion in the settlement and the experience of plaintiffs' counsel who negotiated the settlement."

_United States v. North Carolina_, 180 F.3d 574, 581 (4th Cir. 1999) (citations omitted) (emphasis added).  At the same time, it is also well established that "an intervenor is admitted to the proceeding as it stands, and in respect of the pending issues, but is not permitted to enlarge those issues or compel an alteration of the nature of the proceeding."  _Vinson v. Washington Gas Light Co._, 321 U.S. 489, 498 (1944); 7 Cyc. of Federal Proc. § 24:22 (3rd ed. elec. 2011); _see_ David Shapiro, _Some Thoughts on Intervention Before Courts, Agencies, and Arbitrators_, 81 Harv. L. Rev. 721, 754 (1968)("Another area of potential limitation is on the injection of new issues or the addition of parties by the . . . [intervenor]. Here again the administrative agencies have acted with some success in limiting intervention to particular issues and in resisting undue expansion of the proceedings.").

29

To avoid the unnecessary prolongation and
multiplication of the proceedings, some courts have imposed
conditions upon intervenors of right such as the citizen
organizations here.  The propriety of that course of action has
been the subject of some debate, much of which surrounds the
impact of the Advisory Committee Notes to Rule 24.  Compare,
e.g., Fed. R. Civ. P. 24(a), Advis. Comm. Notes ("An intervention
of right under the amended rule may be subject to appropriate
conditions or restrictions responsive among other things to the
requirements of efficient conduct of the proceedings.") (emphasis
added); United States v. Albert Inv. Co., Inc., 585 F.3d 1386,
1396 (10th Cir. 2009) (quoting and applying Advisory Committee
Notes); Fund For Animals, Inc. v. Norton, 322 F.3d 728, 737 n.11
(D.C. Cir. 2003) (same); Beauregard, Inc. v. Sword Services LLC,
107 F.3d 351, 353 (5th Cir. 1997) (affirming "a firmly
established principle that reasonable conditions may be imposed
even upon one who intervenes as of right"); United States v. Duke
Energy Corp., 171 F. Supp. 2d 560, 565 (M.D.N.C. 2001)
(recognizing the court's ability to impose limitations on
intervention as of right, such as restricting an intervenor's
"ability to initiate unilateral independent discovery without
leave of the court"), with Edwards v. City of Houston, 78 F.3d

983, 1003 (5th Cir. 1996) (en banc) (noting as follows in case
involving intervening applicants challenging a consent decree:
"Lastly, the applicants were allowed to argue their objections to
the court, but did so without the benefit of any discovery. . . .
The perfunctory process employed in this case belittles our
notion of fairness.  That these applicants were deprived not only
of the opportunity to participate in this proceeding with the
rights and privileges of full parties, but also of the
opportunity to adequately prepare and present objections to the
proposed decree, precludes us from concluding that the district
court's denial of intervention was harmless."); Cotter v.
Massachusetts Ass'n of Minority Law Enforcement Officers, 219
F.3d 31, 36 (1st Cir. 2000) ("The traditional sense was that a
court could not impose conditions on an intervention as of right.
However, the 1966 Amendment to Federal Rule of Civil Procedure
24(a) may have changed this rule. District courts have frequently
imposed such conditions, and courts of appeals have sometimes
embraced them, but courts of appeals have commonly reserved the
issue, leaving the extent to which such conditions may be imposed
unclear . . . .") (citations omitted); United States v. Ketchikan
Pulp Co., 74 F.R.D. 104, 108 (D.C. Alaska 1977) ("The government,
while agreeing that intervention is proper, seeks an order
limiting the rights of the intervenors. Nothing in the . . .

31

[Federal Water Pollution Control Act] supports this theory of limited intervention.").

        The leading commentators on the Federal Rules of Civil Procedure, however, take a dim view of the Advisory Committee's position mentioned <u>supra</u>:

> The Advisory Committee cites no authority for this statement and it may be said here, as was said of the Committee in a similar context, "the Advisory Committee's qualification in the Notes of important textual language is a questionable technique." Thus, however desirable it may be that the courts have the power to impose reasonable conditions on intervention of right, the fact that the Committee Note says that they have the power does not create the power if it does not otherwise exist. Nevertheless several courts have shown a willingness to accept the Note at face value and to allow the imposition of conditions on an intervenor of right. So long as these conditions are reasonable and are of a housekeeping nature, this view is likely to prevail. It seems very doubtful, however, that the court has the right to make significant inroads on the standing of an intervenor of right; in particular, it should not be allowed to limit the intervenor in the assertion of counterclaims or other new claims.

7C Charles A. Wright <u>et al.</u>, <u>Federal Practice and Procedure</u> § 1922 (3rd ed. elec. 2011).[7]

---

[7]There is language supportive of the citizen organizations' position on unrestricted participation in <u>Columbus-America Discovery Group v. Atlantic Mut. Ins. Co.</u>, 974 F.2d 450, 469-70 (4th Cir. 1992). The court of appeals, however, did not decide whether restrictive conditions on intervenors of right are ever appropriate. Additionally, the case did not involve a proposed consent decree crafted over a substantial period of time by an
                                                    (continued...)

In any event, the issue need not be resolved at this time.  In its May 2, 2011, memorandum in support of its motion to enter the proposed consent decree, and in its reply brief filed May 31, 2011, the United States offers significant detail respecting the two issues to which the citizen organizations take exception.  The United States attaches, and discusses, materials respecting (1) calculation of the proposed civil penalty, and (2) the reasons underlying the selection of the proposed selenium treatment protocol.

The court has not as yet had the benefit of the citizen organizations' reasoned views on the recent details offered by the United States.[8]  For this reason, the court defers

───────────────

[7](...continued)
agency of the federal sovereign with regulatory jurisdiction over the party to be charged thereunder.

[8]On May 19, 2011, the citizen organizations sought leave to file a response to the United States' motion to enter the consent decree.  The proposed response attached to that motion states only as follows:

> Proposed Intervenors oppose . . . [the] Motion to Enter Consent Decree . . . for the reasons articulated in their [April 6, 2011] comments on the Proposed Consent Decree and the arguments made in support of their motion to intervene and to consolidate. Proposed Intervenors incorporate those by reference as if written herein.

(Citizen Orgs. Prop. Resp at 1).  It would be the court's expectation that the citizen organizations would fully address
(continued...)

33

consideration at this time of whether an evidentiary hearing will
be necessary.  The court additionally ORDERS as follows:

    1.    That the citizen organizations be, and they hereby are,
directed no later than July 20, 2011, to meet and
confer with counsel for the United States pursuant to
Local Rule of Civil Procedure 37.1(b) in an effort to
narrow any areas of disagreement respecting the need
for further discovery in light of the United States'
voluntary disclosures in its recent briefing;

    2.    That to the extent further disagreement remains on the
necessity of further discovery, the citizen
organizations be, and they hereby are, permitted to
move, in a particularized and specific way, to compel
no later than July 25, 2011, any further discovery that
they deem necessary, with response and reply in
accordance with the Local Rules of Civil Procedures;

    3.    That if no further discovery is deemed necessary, the
citizen organizations be, and they hereby are, directed
to file no later than July 15, 2011, a reasoned

--------

[8](...continued)
why the United States' position, stated in its May 2 and May 31,
2011, filings, does not adequately explain the choices reflected in
the proposed consent decree.

34

response to the United States' May 2 and May 31, 2011,
briefing respecting its request to enter the proposed
consent decree, to which the remaining parties may
respond by August 1, 2011, with any reply filed no
later than August 10, 2011.


B.   Motion to Consolidate

        The citizen organizations move to consolidate the
claims in the Huntington and Charleston actions regarding the
selenium exceedances at WV/NPDES WV1003763.  Federal Rule of
Civil Procedure 42(a) provides as follows:

    If actions . . . involve a common question of law or
    fact, the court may: . . . join for hearing or trial
    any or all matters at issue in the actions; . . .
    consolidate the actions; or . . . issue any other
    orders to avoid unnecessary cost or delay.

Fed. R. Civ. Proc. 42(a).


        Our court of appeals has given the district courts a
wide berth on questions arising under Rule 42(a), recognizing the
superiority of the trial court in determining how best to
structure similar pieces of litigation.  See A/S J. Ludwig
Mowinckles Rederi v. Tidewater Const. Co., 559 F.2d 928, 933 (4th
Cir. 1977) ("District courts have broad discretion under
F.R.Civ.P. 42(a) to consolidate causes pending in the same

35

district.")  Nevertheless, the court of appeals has also provided
guidelines for district courts engaging in the discretionary
exercise.  See <u>Arnold v. Eastern Air Lines, Inc.</u>, 681 F.2d 186,
193 (4th Cir. 1982):

> The critical question for the district court in the
> final analysis was whether the specific risks of
> prejudice and possible confusion were overborne by the
> risk of inconsistent adjudications on common factual
> and legal issues, the burden on parties, witnesses and
> available judicial resources posed by multiple
> lawsuits, the length of time required to conclude
> multiple suits as against a single one, and the
> relative expense to all concerned of the single-trial,
> multiple-trial alternatives.

<u>Id.</u> at 193.

As the citizen organizations concede, there is little
risk of inconsistent adjudications.  Judge Chambers has held in
abeyance any further development in the Huntington action of the
permit exceedances at issue in the Charleston action.  He has
also forecast that the proposed consent decree likely moots the
claim in the Huntington action on that point.  In view of Judge
Chambers' ruling, and the intervention of the citizen
organizations allowed by the court herein, nothing appears to be
gained by consolidation.  Judge Chambers reached a similar
conclusion recently in the Huntington action.  <u>Ohio Valley</u>

Environmental Coalition, Inc. et al v. Coal-Mac, Inc., No. 3:10-0833, slip op. at 3 (S.D. W. Va. Jul. 16, 2011).[9]

The court, accordingly, ORDERS that the citizen organizations' motion to consolidate be, and it hereby is, denied.

The Clerk is requested to transmit this written opinion and order to all counsel of record and to any unrepresented parties.

DATED:  June 22, 2011

John T. Copenhaver, Jr.
United States District Judge

---

[9] The citizen organizations emphasize that they seek a narrow consolidation.  They assert the court could join before a single judge all claims for selenium exceedances under WV/NPDES WV1003763.  Again, little is gained by that approach.  It would involve either (1) severing out important provisions of an interwoven and comprehensive consent decree, or (2) transferring a claim in a complex environmental case to a judicial officer who did not adjudicate the matter of liability related thereto.  Both options are unsuitable.

37