UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON


UNITED STATES OF AMERICA and
STATE OF WEST VIRGINIA,
by and through the
WEST VIRGINIA DEPARTMENT OF
ENVIRONMENTAL PROTECTION, and
COMMONWEALTH OF KENTUCKY,
by and through the,
ENERGY AND ENVIRONMENT CABINET,

        Plaintiffs


v.                                      Civil Action No. 2:11-0133


ARCH COAL, INC. and
COAL MAC, INC. and
LONE MOUNTAIN PROCESSING, INC. and
CUMBERLAND RIVER COAL COMPANY and
MINGO LOGAN COAL COMPANY,

        Defendants


MEMORANDUM OPINION AND ORDER


        Pending are (1) the United States' motion to enter the
proposed consent decree, filed May 2, 2011, and (2) the motions
to dismiss and withdraw claims by Ohio Valley Environmental
Coalition, Inc., Sierra Club, and West Virginia Highlands
Conservancy, Inc. ("citizen organizations"), filed September 6,
2011.

In discussing the circumstances of this case, the court will refer to this litigation as the "Charleston action." Reference will be made as well to <u>Ohio Valley Environmental Coalition, Inc. et al v. Coal-Mac, Inc.</u>, No. 3:10-0833, the "Huntington action", pending before the Honorable Robert C. Chambers.

I.

A.   The Huntington Action

On April 14, 2010, the citizen organizations gave notice to Coal-Mac, Inc. ("Coal-Mac"), Mingo Logan Coal Company ("Mingo Logan"), the United States Environmental Protection Agency ("EPA"), the Office of Surface Mining, Reclamation, and Enforcement ("OSMRE"), and the West Virginia Department of Environmental Protection ("WVDEP") of their intention to institute a civil action against Coal-Mac and Mingo Logan for certain alleged federal environmental law violations.

The citizen organizations allege that, despite this notice, EPA, OSMRE, and WVDEP failed to seasonably commence a civil or criminal action to redress the alleged violations, or an

2

administrative penalty action.  On June 11, 2010, however, the United States informed the citizen organizations that it was in negotiations with Arch Coal, Inc. ("Arch"), the parent corporation of Coal-Mac and Mingo Logan.  The negotiations were aimed, in part, at addressing violations of selenium discharge limits by defendants.  One focus of the discussions was West Virginia/National Pollution Discharge Elimination System ("WV/NPDES") permit WV1003763.[1]

The United States sought out the citizen organizations' views at multiple points.  After months of intense negotiations, set forth more fully below, the United States provided the citizen organizations with draft language of the injunctive relief provisions found in the draft proposed consent decree.  It also engaged the citizen groups and their expert respecting the selenium treatment provisions of the draft proposed consent decree.  Following these discussions, the United States sent a detailed letter to the citizen organizations purporting to address each of their concerns regarding selenium treatment.  The United States then made revisions to the draft proposed consent decree and finalized it.

---

[1]West Virginia is authorized to administer a state-run NPDES program pursuant to 33 U.S.C. § 1342(b).  WVDEP is the permitting authority for the state's NPDES program.

3

On June 17, 2010, the citizen organizations instituted the Huntington action for declaratory and injunctive relief. They accused Coal-Mac and Mingo Logan of violating the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq. ("Clean Water Act" or "CWA"), and the Surface Mining Control and Reclamation Act, 30 U.S.C. § 1201 et seq. ("SMCRA").

The citizen organizations specifically alleged, inter alia, that Coal-Mac and Mingo Logan are discharging selenium into waters of the United States in persistent violation of section 301 of the Clean Water Act, 33 U.S.C. § 1311, and of the conditions and limitations found in four  WV/NPDES permits issued to those two defendants by the State of West Virginia.

One of the referenced WV/NPDES permits is WV1003763, issued to Coal-Mac to regulate discharges at its Hobet No. 7 Mine.  The "permit governs discharges into the Left Fork of Right Fork of Trace Fork of Pigeon Creek from Outfall 002." Ohio Valley Environmental Coalition, Inc. v. Coal-Mac, Inc., 775 F. Supp.2d 900, 905 (S.D. W. Va. 2011).  The material allegations in the Huntington action relating to WV/NPDES WV1003763 are as follows:

> Coal-Mac has accrued at least 440 days of violation of
> the selenium limits on Outfall 002 by discharging
> selenium in excess of the final effluent limitations
> for selenium from Outfall 002 on 29 occasions . . . .

**4**

> On the basis of Coal-Mac's pattern of violations
> of its effluent limitations . . . and the absence of
> any evidence of any meaningful efforts by Coal-Mac to
> eradicate the cause of the violations, Plaintiffs
> allege that Coal-Mac is in continuing and/or
> intermittent violation of the Clean Water Act . . . .

(Huntington Action Compl. ¶¶ 49-50).

On March 31, 2011, Judge Chambers entered a memorandum opinion and order.  He concluded, _inter alia_, that the citizen organizations were entitled to judgment as a matter of law respecting their claim relating to WV/NPDES WV1003763.  The effect of that ruling, however, was subject to the following proviso:

> The Consent Decree entered into by Defendant Coal-Mac
> and the EPA [that is the subject of the Charleston
> action] establishes a Selenium Compliance Plan with
> regard to Coal-Mac's WV/NPDES Permit 1003763, Outfall
> 002.  The Consent Decree is currently before the court
> in . . . [the Charleston action], and will only become
> final if and when the court approves it.  As the Court
> finds that the Consent Decree [in the Charleston
> action] most likely moots Plaintiffs' claims with
> respect to this permit, it STAYS the effect of this
> Opinion on WV/NPDES Permit 1003763. When a decision is
> reached on the Consent Decree [in the Charleston
> action], the parties are DIRECTED to inform the Court
> of its final disposition, at which point the Court will
> determine whether Plaintiffs' claims with regard to
> Coal-Mac's WV/NPDES Permit 1003763 should be dismissed
> on mootness or _res judicata_ grounds.

_Coal-Mac_, 775 F. Supp.2d at 929.

B.    The Charleston Action


        Plaintiffs in the Charleston action are the United
States, the State of West Virginia, by and through WVDEP, and the
Commonwealth of Kentucky, by and through the Kentucky Energy and
Environment Cabinet ("KEEC").  The principal defendant is Arch.
The remaining defendants are Coal Mac, Lone Mountain Processing,
Inc., Cumberland River Coal Company, and Mingo Logan
(collectively "the subsidiary defendants").

        Arch manages, directs, or controls environmental
compliance at facilities owned by the subsidiary defendants.  As
a result of their coal mining and processing operations, the
subsidiary defendants generate coal slurry, wastewater, and other
spoil-type materials that consist of, or contain, pollutants
including iron, aluminum and manganese, certain solids, and
selenium.

        On December 20, 2007, the EPA sought what appears to be
an effluent spreadsheet from Arch for various permits issued to
the subsidiary defendants.  EPA wished to ascertain all effluent
limitation exceedances occurring from January 1, 2003, through
January 1, 2008.  Arch ultimately produced the information
through December 30, 2010.  The document reflects a total of at

6

least 808 discharge violations.  Other illegal discharges were
cited or noticed by West Virginia and Kentucky as well.
Plaintiffs allege that the subsidiary defendants' unpermitted and
exceedance discharges caused, or have the potential to cause,
environmental harm, including degradation to various waterways
and associated aquatic ecosystems.

On March 1, 2011, plaintiffs instituted this action
against defendants.  It is brought pursuant to federal, West
Virginia, and Kentucky law.  Plaintiffs allege that defendants
have discharged, and will continue to discharge, pollutants into
waters of the United States, West Virginia, and Kentucky in
violation of those laws.

Plaintiffs also allege that defendants are in violation
of the conditions and limitations of NPDES permits issued by,
inter alia, West Virginia and Kentucky pursuant to state and
federal law.  They seek permanent injunctive relief and civil
penalties against defendants to halt the illegal discharges, as
authorized by the statutes proscribing the violations.

C.   The Proposed Consent Decree Lodged in the Charleston Action

Simultaneous with the institution of the Charleston
action, the United States filed the proposed consent decree

mentioned above, along with a notice reflecting its lodging with the court ("notice of lodging").  Some of the work preceding the negotiated resolution is found in the memorandum in support of the United States' motion to enter the proposed consent decree:

> The Decree was reached only after two and a half years of arms-length negotiations between the parties, each of whom was represented by qualified counsel. Many issues were vehemently contested, and over the years of negotiations there were multiple in-person meetings along with countless phone calls and emails, resulting in the exchange of numerous proposed injunctive relief drafts. Negotiations were based on information provided in response to EPA's information request under Section 308 of the Act, information provided by WVDEP and Kentucky, input from experienced scientists within the relevant government agencies, input from expert consultants hired by the United States, and visits to facilities owned and operated by Defendants. Moreover, the United States provided the Citizen Groups an opportunity to comment on multiple occasions and assessed those comments in determining the appropriateness of the proposed settlement.

(U.S. Memo. in Supp. at 11).

It appears that the United States, on March 7, 2011, published the notice of lodging in the Federal Register.  It provided that "The Department of Justice w[ould] accept comments relating to the proposed consent decree for a period of thirty (30) days from the date of publication of th[e] notice."  Not., 76 Fed. Reg. 12369 (Mar. 7, 2011).  In its March 1, 2011, notice of lodging, the United States stated that, "If, after review and evaluation of any comments received, the United States continues

to believe that the . . . [proposed consent decree] is fair, reasonable, and in the public interest, it will move the Court to enter" it.  Id.  On April 6, 2011, the citizen organizations filed with the United States the only comments received concerning the proposed consent decree.

The proposed consent decree specifically addresses WV/NPDES WV1003763.

> Selenium. This . . . [proposed consent decree] only addresses violations of selenium effluent limits relating to NPDES permit No. WV1003763, Outlet 002. The provisions of this . . . [proposed consent decree] do not otherwise apply to selenium effluent limits applicable to Defendants' Facilities or Future Facilities.

(See Prop. Cons. Decr. ¶ 9).  Article VIII of the proposed consent decree governs "SELENIUM INJUNCTIVE RELIEF."  The material provisions found there are as follows:

1.  Defendants have applied for the permits necessary to implement the Selenium Compliance Plan attached as Exhibit C to the proposed consent decree;

2.  The Selenium Compliance Plan calls for construction of a passive biological treatment mechanism capable of treating 60 gallons of water per minute from an 8.7 acre watershed;

3.  Within the later of 30 days after receiving the permits or April 15, 2011, defendants must commence construction of the Selenium Treatment System called for in the proposed consent decree;

4.  No later than the later of 100 days after receiving the permits or July 24, 2011, the Selenium Treatment System must be operational;

5.     Once the Selenium Treatment System becomes operational, and for 365 days after the December 31, 2011, Selenium Compliance Deadline by which compliance with the selenium limits must be achieved, defendants must conduct rigorous sampling; and

6.     Within 180 days after commencing operation of the Selenium Treatment System, but no later than November 1, 2011, defendants must submit to the United States and West Virginia a Selenium Treatment System Evaluation Report.[2]

        The proposed consent decree also calls for an Alternative Selenium Compliance Plan in the event that the Selenium Treatment System fails to achieve certain specified remedial benchmarks.  The Alternative Selenium Compliance Plan, which appears to have already been presented to the United States for approval, along with West Virginia for review, involves

_____

        [2]The Selenium Treatment System Evaluation Report will include:

        (a) an evaluation of the System's effectiveness in removing selenium up to the time of the Selenium Treatment System Evaluation Report; (b) an analysis of the System's impact, if any, on discharges of other pollutants regulated by NPDES permit No. WV1003763; [and] (c) an analysis, including supporting documentation, of whether the system will ensure compliance with Selenium Limits by the Selenium Compliance Deadline, taking into account implementation of any proposed changes to improve the performance of the system, if appropriate.

(Prop. Consent Decr. ¶ 64).  Other reporting obligations appear in paragraph 76 of the proposed consent decree.

10

installation of a "Reverse Osmosis or Active Biological Treatment system [that will] . . . include a detailed schedule for design and implementation of one of those systems."  (Id. ¶ 68).

Plaintiffs have additionally "reserve[d] their right to seek other injunctive relief for violations of the Selenium Limits after the [December 31, 2011, deadline] . . . ."  (Id. ¶ 71).  Stipulated penalties in amounts ranging from $1,000 to $15,000 per day apply to any violations of the section of the proposed consent decree dealing with selenium-related injunctive relief.

Article XX of the proposed consent decree governs termination, and provides as follows:

> After Defendants have completed the requirements of Paragraphs 30-41 (Compliance Management System and CMS Audit) of this Decree and have thereafter maintained continuous satisfactory compliance with Section VI (Compliance Requirements), Section VII (Injunctive Relief), and Section IX (Reporting Requirements) of this Consent Decree <u>for a period of four years</u>; <u>have completed the requirements of Section VIII</u> (Selenium Injunctive Relief); and have paid the civil penalty and any accrued stipulated penalties as required by this Consent Decree, Defendants may serve upon the United States and the States a Request for Termination, stating that Defendants have satisfied those requirements, together with all necessary supporting documentation.

(See Prop. Cons. Decr. ¶ 136 (emphasis added)).

11

On April 14, 2011, the citizen organizations moved to intervene in the Charleston action.  On June 22, 2011, the court permitted intervention to allow the citizen organizations to be heard on, (1) the suitability of the proposed civil penalty as it relates to the selenium violations, and (2) the putatively superior selenium treatment protocols advanced by the citizen organizations.  The court then set a calendar for further case events.

One requirement of the schedule was that the citizen organizations "file no later than July 15, 2011, a reasoned response to the United States' May 2 and May 31, 2011, briefing respecting its request to enter the proposed consent decree, to which the remaining parties may respond by August 1, 2011, with any reply filed no later than August 10, 2011."  (Memo. op. at 34-35).

On July 15, 2011, the citizen organizations moved to suspend the case schedule.  They represented that they were in the midst of negotiating, and had reached an agreement in principle about, a proposed consent decree in the Huntington action.  One term of that accord apparently called for the citizen organizations to withdraw from the Charleston action.  On August 3, 2011, the court extended the aforementioned briefing

deadlines by approximately 30 days.  On September 6, 2011, the
citizen organizations moved to dismiss their claims and withdraw
from the Charleston action.

On September 9, 2011, the court addressed that request
as follows:

> It is unclear in the motion if the . . . [citizen
> organizations] additionally desire to withdraw their
> objections, presented herein, during the comment
> period, and on any other occasion, respecting the
> proposed consent decree. The court, accordingly, ORDERS
> as follows:
>
> > 1. That . . . [citizen organizations] be, and
> > they hereby are, directed no later than
> > September 19, 2011, to advise the court if
> > they wish to withdraw their objections; and
> >
> > 2. That the parties other than the . . .
> > [citizen organizations] be, and they hereby
> > are, directed to inform the court no later
> > than September 23, 2011, whether any
> > impediment remains to the court treating the
> > record herein as submitted for purposes of
> > passing on the proposed consent decree.

(Ord. at 1-2).  On September 13, 2011, the citizen organizations
responded to the September 9, 2011, order, stating "that they
respectfully withdraw any objections that they have made to the
proposed consent decree in their comments on that decree or
elsewhere."  (Cit. Orgs. Resp. at 1).  On September 15, 2011, the
court received separate responses from plaintiffs and defendants
advising that there were no impediments to the court considering

13

the matter submitted for review.  Both plaintiffs and defendants represented that the proposed consent decree is now unopposed. No individual has challenged that assertion.

The court, accordingly, ORDERS that the citizen organizations' motion to dismiss and withdraw claims be, and it hereby is, granted.  It is further ORDERED that the claims and objections presented by the citizen organizations, in the Charleston action, in their comments respecting the proposed consent decree or elsewhere, be, and they hereby are, deemed as dismissed and withdrawn.

II.

Our court of appeals has observed that "a consent decree 'has elements of both judgment and contract,' and is subject to 'judicial approval and oversight' generally not present in other private settlements." <u>Szaller v. American Nat. Red Cross</u>, 293 F.3d 148, 152 (4th Cir. 2002) (quoting <u>Smyth v. Rivero</u>, 282 F.3d 268, 279-80 (4th Cir. 2002)); <u>see also Local No. 93, Int'l Assn. of Firefighters, AFL-CIO v. Cleveland</u>, 478 U.S. 501, 519 (1986); <u>United States v. ITT Continental Baking Co.</u>, 420 U.S. 223, 237 n.10 (1975) (citation omitted); <u>Alexander v. Britt</u>, 89 F.3d 194, 199 (4th Cir. 1996).

14

It has expanded upon this principle in <u>Smyth</u>, observing that a court is expected, when presented with a proposed consent decree, to scrutinize the accord and make certain findings prior to entry:

> Because it is entered as an order of the court, the terms of a consent decree must also be examined by the court. As Judge Rubin noted in <u>United States v. Miami</u>,
>
>> Because the consent decree does not merely validate a compromise but, by virtue of its injunctive provisions, reaches into the future and has continuing effect, its terms require more careful scrutiny. Even when it affects only the parties, the court should. . . examine it carefully to ascertain not only that it is a fair settlement but also that it does not put the court's sanction on and power behind a decree that violates Constitution, statute, or jurisprudence.
>
> 664 F.2d at 441 (Rubin, J., concurring). In other words, a court entering a consent decree must examine its terms to ensure they are fair and not unlawful.

<u>Smyth</u>, 282 F.3d at 280.

The standards governing consideration of a proposed consent decree are described further by <u>United States v. North Carolina</u>, 180 F.3d 574, 581 (4th Cir. 1999):

> In considering whether to enter a proposed consent decree, a district court should [1] be guided by the general principle that settlements are encouraged. Nevertheless, a district court should not blindly accept the terms of a proposed settlement. <u>See</u> <u>Flinn v. FMC Corp.</u>, 528 F.2d 1169, 1173 (4th Cir.1975). Rather, before entering a consent decree the court must satisfy itself that [2] the agreement "is fair, adequate, and

reasonable" and [3] "is not illegal, a product of collusion, or against the public interest." <u>United States v. Colorado</u>, 937 F.2d 505, 509 (10th Cir. 1991). In considering the fairness and adequacy of a proposed settlement, the court <u>must assess the strength of the plaintiff's case</u>. See <u>Flinn</u>, 528 F.2d at 1172-73. While this assessment does not require the court to conduct "a trial or a rehearsal of the trial," <u>the court must take the necessary steps to ensure that it is able to reach "an informed, just and reasoned decision.</u>" <u>Id.</u> (internal quotation marks omitted). In particular, the "court should consider <u>the extent of discovery that has taken place, the stage of the proceedings, the want of collusion in the settlement and the experience of plaintiffs' counsel who negotiated the settlement</u>." <u>Carson v. American Brands, Inc.</u>, 606 F.2d 420, 430 (4th Cir. 1979) (en banc) (Winter, Circuit Judge, dissenting), adopted by <u>Carson v. American Brands, Inc.</u>, 654 F.2d 300, 301 (4th Cir. 1981) (en banc)(per curiam).

<u>Id.</u> at 581 (emphasis supplied).


### III.


As noted in <u>North Carolina</u>, the court accepts the general proposition that settlements are encouraged.  The consideration is especially <u>apropos</u> in this action, which appeared poised to consume a significant amount of time and expense by the parties, including the public fisc, along with a substantial redirection of judicial resources.

Regarding the fairness, adequacy, and reasonableness of the accord, there has been no formal discovery.  There has, however, been two-and-one-half years of extensive negotiations.

No one challenges the following summary by the United States:

> The parties engaged in settlement negotiations over the next two and a half years, including numerous face to face meetings and countless teleconferences, letters, and emails in an attempt to resolve the parties' significant differences over the appropriate injunctive relief and civil penalty.  During this time period, the United States visited several of Defendants' mining facilities and conducted extensive data collection relating to Defendants' violations. In addition to the technical support provided by scientists within the Region and at WVDEP, EPA Region 3 reached out to specialists within EPA on various topics, including the sufficiency of Defendants' proposed Compliance Management System, potential environmental impact from Defendants' discharges, and local watershed characteristics.  The United States also engaged a mining consultant to help evaluate Defendants' operations, provide input on injunctive relief, develop a model for calculating economic benefit from failing to properly operate and maintain treatment systems, and analyze GIS mapping data for relevant sites.

(Memo. in Supp. of Entr. at 4-5 (citations omitted)).  As in United States v. Patriot Coal Corp., No. 2:09-0099, 2009 WL 1210622 (S.D. W. Va. Apr. 30, 2009), "plaintiffs seem to have developed, without the need for extensive litigation, a substantial case to support the relief requested in the complaint."  Id. at *5.

The parties' pre-suit negotiations have undeniably resulted in positive steps to correct the over 800 violations of the CWA alleged by plaintiffs.  The detailed plan for addressing selenium exceedances under WV/NPDES WV1003763 is emblematic of

that effort.  The proposed consent decree also has other
significant injunctive requirements to foster compliance, along
with a civil penalty of $4 million.  Specifically, the following
provisions are important:

1.  Plaintiffs have not waived their right to pursue future
    CWA violations or those not alleged in their complaint.

2.  According to plaintiffs, the Compliance Management
    System ("CMS") and related measures proposed by the
    parties to detect and prevent treatment system failures
    are similar to those approved in United States v.
    Patriot Coal Corp., No. 2:09-0099.  Those similar
    measures have "resulted in a dramatic decrease of
    violations" for Patriot's facilities.  (Memo. in Supp.
    of Entr. at 8).  Plaintiffs note as well that the CMS
    and related measures "were recommended by consulting
    experts and approved by scientists within the relevant
    government agencies."  (Id. at 12).

3.  Some of the provisions of the proposed decree have been
    implemented and are working.  (See Defs.' Resp. at 2
    ("Arch . . . has completed construction of the selenium
    treatment system . . . provided for in the Decree, that
    the system is operational, and has been successful in
    treating selenium to levels compliant with the
    applicable permit requirements . . . .")).

4.  There is no current challenge to plaintiffs'
    representation that the "civil penalty [is] well above
    the economic benefit achieved from non-compliance . . .
    ."  (Memo. in Supp. of Entr. at 12).

5.  The citizen organizations were involved in the
    negotiation process.  (Memo. in Supp. of Entr. at 6
    (noting that the citizen groups were "provide[d] an
    opportunity to comment, which comments were taken into
    consideration by the United States during ongoing
    negotiations" and "the United States shared draft
    injunctive relief language with the Citizen Groups to
    provide another opportunity to comment prior to
    finalization of the Decree" and "the United States had

two additional substantive conversations with the
Citizen Groups, including one with their consultant . .
. .")).

It is noteworthy as well that the proposed consent
decree is sponsored, in part, by the environmental regulators in
their respective spheres authorized by Congress, the Legislature,
and the Commonwealth with enforcing various federal and state
water quality laws.  As in Patriot Coal,

> The EPA and DEP are governmental agencies that employ
> individuals specially trained and familiar with the
> relevant scientific disciplines and governing law.  The
> decision to avoid what might well have been a costly
> and time-consuming diversion of limited agency
> resources appears to have been a reasonable one under
> the circumstances.

Id. at *5.

As noted, the citizen organizations have withdrawn
their objections and comments.  It is important to emphasize that
the objections and comments challenged only a very small portion
of the proposed consent decree dealing with correction of
selenium exceedances. (See Memo. in Supp. of Entr. at 6
("Ninety-six percent of the alleged violations are for pollutant
parameters other than selenium.")).  Given their historically
aggressive pursuit of environmental compliance, the citizen
organizations' silence on the remainder of the parties' plan, and
the lack of objection by any other individual or organization, is
significant.

19

Having taken account of all of the applicable factors, it is apparent that plaintiffs have obtained large-scale water quality compliance without the cost, delay, and misdirection of resources that might have otherwise happened during time-consuming civil litigation.  The court, accordingly, finds that the proposed consent decree is fair, adequate, and reasonable. The court further finds the accord is neither illegal nor the product of collusion and that it serves the public interest.  In view of these findings, and inasmuch as no person has opposed entry of the proposed consent decree, the court ORDERS as follows:

1.   That the United States' unopposed motion to enter the proposed consent decree be, and it hereby is, granted;

2.   That the proposed consent decree be, and it hereby is, entered with the court's approval this same date; and

3.   That this action be, and it hereby is, dismissed and stricken from the docket, with the court retaining jurisdiction pursuant to Article XVIII of the consent decree and any other provision therein contemplating the potential for future action by the court.

20

The Clerk is requested to transmit this written opinion and order to all counsel of record and to any unrepresented parties.

DATED: November 7, 2011

John T. Copenhaver, Jr.
United States District Judge

21